# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 11-60642-CIV-TORRES

"IN ADMIRALTY"

ROBERT KLENNER,

      Plaintiff,

vs.

M/Y EL PRESIDENTE, Official No. 1036726, her
Engines, equipment, tackle, furnishings, etc. *in rem*,

      Defendant,

and

MICHAEL WALDO,

      Intervenor.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a bench trial conducted in this action. Plaintiff Robert Klenner ("Klenner") instituted this action *in rem* by filing a complaint [D.E. 1] against the vessel M/Y El Presidente ("the vessel"). The complaint, filed March 24, 2011, sought a determination of the vessel's ownership and, in the alternative, a salvage award. Intervenor Michael Waldo ("Waldo") filed his complaint in intervention [D.E. 13] on April 27, 2011, seeking a declaratory judgment as to the vessel's ownership and restoration of the vessel to his possession.

Klenner claims that he obtained ownership of the vessel as a finder after it was abandoned by Larry Abromavich, its prior inhabitant, when Abromavich committed suicide. Klenner claims the vessel was sold by Waldo to Abromavich, and therefore Waldo retains no ownership interest in it. In the alternative, Klenner claims that he rescued the vessel from peril because the vessel was at risk of sinking when he took possession of it, and he is therefore entitled to a salvage award for all costs related to his rescue efforts.

Waldo counters Klenner's abandonment claim by arguing that he never sold the vessel to Abromavich, that he retains ownership of the vessel, and that he never abandoned the vessel. He counters Klenner's salvage claim by arguing that the vessel was neither at risk of sinking nor in peril at any relevant time.

The Court concludes that Waldo owns the vessel and rejects Klenner's claim of ownership based on abandonment. The Court also rejects Klenner's claim to compensation under the law of salvage. However, under the Federal Maritime Lien Act, Klenner is entitled to a maritime lien of $8,080.00 against the vessel arising from necessaries he procured for it between January 21, 2011, and February 28, 2011. Waldo, however, remains the owner of the vessel and rightfully entitled to its possession and custody.

## I.   FINDINGS OF FACT

### A.   <u>Background of the Vessel</u>

1.      "El Presidente" is a 40.5-foot vessel of unknown age. Its title was first registered with the U.S. Coast Guard in 1995. Following its initial registration with

the Coast Guard, title to the vessel was transferred several times before Cameron Averill ("Averill") bought the vessel and registered title in his name in March, 2002. At the time this action was filed in March, 2011, Averill remained the last recorded titleholder of the vessel.

2.     While owned by Averill, the vessel was severely damaged on Lake Okeechobee by Hurricane Jeanne in September, 2004. Although the vessel was repaired to a functional state, damage to various parts remained.

3.     Averill sold the damaged vessel on October 20, 2004, to Midriver Marine LLC, a boat repair, salvage, and brokerage firm based in Ft. Lauderdale, FL. Averill and Midriver Marine executed a bill of sale that was filed with the Coast Guard on June 13, 2005. Due to unidentified recording deficiencies, the Coast Guard terminated the transfer process on June 15, 2005, and title never transferred out of Averill's name.

4.     The Intervenor, Waldo, was first introduced to the vessel in 2007 by Andre Hardy ("Hardy"), a ship broker and agent of Midriver Marine. Despite the damage the vessel had sustained, Waldo was interested in it for his salvage and ship sale business. He hoped to live on the vessel for a brief time, complete necessary repairs, and then sell it.

5.     Rather than pay for the vessel in currency, Waldo and Midriver Marine agreed to an "even swap," whereby Waldo exchanged one of his 33-foot sailboats for the vessel. Waldo agreed to pay Hardy a commission of approximately $1,000 for his efforts in brokering the deal, as well as $250 required for Hardy to transfer the vessel's title to Waldo through the Coast Guard. The parties executed a bill of sale for the vessel on

February 12, 2007, which was notarized the same day. The date next to Waldo's signature on the bill of sale erroneously identifies the year as 2006 rather than 2007, although the date next to the notary's stamp is correct.

6.      Although the boats were traded immediately, Waldo was unable to pay Hardy the entire $1,250 balance in February, 2007. Hardy and Waldo agreed that Hardy would file the necessary paperwork with the Coast Guard once Waldo had paid Hardy's entire commission. Because Waldo never paid Hardy's entire commission, the paperwork was never filed with the Coast Guard, and title for the vessel never transferred to Waldo's name. After Waldo and Hardy finally negotiated a reduced commission of $800 in February, 2010, Hardy gave all relevant documentation to Waldo, informing him that he would need to arrange for title transfer himself.

7.      Waldo lived on the vessel at the Sands Harbor Marina in Pompano Beach, FL, for approximately two years. Because the vessel remained docked during this time, Waldo did not feel compelled to complete the title transfer process. He was also accustomed to not completing title transfers to his name for boats that he intended on selling within a short time.

8.      After living on the vessel for two years, Waldo purchased a larger boat on which he chose to live. Waldo moved out of the vessel in 2009.

**B.    _Abromavich's Possession of the Vessel and Suicide_**

9.      When Waldo moved out of the vessel, he permitted his friend of several years, Larry Abromavich, to live on it. In exchange, Abromavich agreed to pay for

docking fees, to maintain the vessel from sinking, and to pay Waldo periodic rent when he was able to do so.

10.     The arrangement between Waldo and Abromavich was beneficial to Waldo because he was responsible for the maintenance and docking fees of several boats he owned at the time, and the arrangement with Abromavich therefore reduced his expenses. Waldo also hoped to sell the boat to Abromavich once Abromavich received funds from a personal injury suit he had won. Waldo believed Abromavich would be more inclined to purchase the vessel if Abromovich were already living on it when the funds became available to him.

11.     The arrangement between Waldo and Abromavich was beneficial to Abromavich because he had previously lived in a loft space of a warehouse that could only be accessed by climbing a ladder. When Abromavich sustained back injuries, climbing the ladder each day became extremely difficult. Abromavich was able to access the living quarters on the vessel much more easily than he could access the loft space.

12.     In April, 2009, Abromavich arranged to dock the vessel behind the home of Elizabeth Mellon ("Mellon") in Lighthouse Point, FL. Waldo drove the vessel for Abromavich to Mellon's home because Abromavich did not know how to operate the vessel, and because Waldo had configured the vessel's electrical system so that only he could start the engines. Waldo was therefore aware of the vessel's location and could drive by Mellon's property on a regular basis to ensure the vessel remained there.

13.     Abromavich purchased the vessel's dinghy from Waldo and registered its title in his name.

14.     In the year that followed, Waldo began traveling frequently and fell out of touch with Abromavich. However, Waldo still drove by Mellon's property on a less frequent basis to verify the location of the vessel.

15.     Abromavich committed suicide on the vessel on September 19, 2010. Officers of the Lighthouse Point Police Department notified Abromavich's family in Virginia of his death, and his son traveled to Lighthouse Point to collect Abromavich's possessions from the vessel. When asked about the vessel, his son told police that he knew nothing regarding its ownership and indicated that Abromavich's family wanted nothing to do with the vessel.

16.     Lighthouse Point Police were unable to determine ownership of the vessel through a title search. The last titleholder on record, Brent Averill, could not be immediately located, and although the vessel's abstract of title lists the failed transfer to Midriver Marine in 2005, the company was dissolved in 2009. Mellon was unable to contact Waldo because she did not have his name, contact information, or knowledge of his ownership. The vessel remained at Mellon's dock, and Lighthouse Point Police considered it to be her responsibility.

17.     On November 8, 2010, Mellon received a Notice of Violation from the City of Lighthouse Point. The Notice indicated that Mellon would be fined $250 per day if the vessel remained unregistered and docked at her home for more than one week.

Fearing the accumulation of substantial fines, Mellon made plans to have the vessel removed from her dock by a local towing company, Offshore Towing Marine.

18.     The City of Lighthouse Point did not fine Mellon after one week. The police were sympathetic of her predicament and gave her additional time to arrange for the vessel's removal.

19.     Before the vessel's scheduled removal by Offshore Towing Marine, Mellon met Klenner through friends who were aware of Mellon's problems with the vessel. Mellon told Klenner that the vessel was abandoned and that he could keep the vessel if he would simply remove it from her dock. Klenner contacted the Lighthouse Point Police regarding the vessel and was told by an agent that the vessel's owner could not be located and that the agent therefore thought the vessel to be abandoned. Klenner agreed to take the vessel from Mellon's dock in January, 2011.

20.     In the four months between Abromavich's death in September, 2010, and Klenner's decision to take the vessel in January, 2011, the boat remained at Mellon's dock in Lighthouse Point, FL. During this time, Waldo was still able to drive by Mellon's property and confirm the location of the vessel. Because Waldo had fallen out of touch with Abromavich, and because the vessel remained where it was supposed to be, Waldo was not alerted to the fact that anything unusual was occurring with the vessel.

**C.     _Klenner's Possession of the Vessel and Negotiations with Waldo_**

21.     On January 21, 2012, Klenner and his son towed the vessel from Mellon's dock in Lighthouse Point to the 14th Street Causeway in Pompano Beach, and then to

Hideaway Marina in Pompano Beach. While at the 14th Street Causeway, the vessel was seen by agents of the Broward County Sheriff's Department who knew the vessel belonged to Waldo. These agents were familiar with Waldo because he had done salvage work for the Sheriff's Department in the past, and because the Sands Harbor Marina, where Waldo had lived on the vessel for almost two years, is located close to the Broward County Sheriff's fueling station at the 14th Street Causeway. Agents of the Sheriff's Department were initially unable to contact Waldo regarding the movement of the vessel because he was out of town.

22.    The value of the towing services Klenner provided the vessel on January 21, 2012, totaled $3,700. Klenner was aware of the possibility that an unknown party may eventually claim ownership of the vessel, and he therefore filed a claim of lien against the vessel for the value of the towing services provided. Pursuant to Fla. Stat. § 713.585, Klenner filed a Good Faith Notice with the Lighthouse Point Police Department documenting his lien.

23.    Klenner also made various repairs to the vessel on January 21, 2011, and February 4, 2011. The value of these repairs totaled $3,730. Additionally, Klenner spent $250 to dock the boat between January 21, 2011 and February 1, 2011. Thus, as of February 4, 2011, Klenner had procured towing, repair, and docking services for the vessel totaling $7,680.

24.    On or about February 14, 2011, agents of the Broward County Sheriff's Department were finally able to contact Waldo. They informed him that the vessel had been moved from Mellon's dock three weeks earlier and had been seen at the 14th

Street Causeway in Pompano Beach. The agents also informed Waldo of Abromavich's death. Waldo told the agents that he had not permitted the vessel to be moved, and the agents then began searching for the vessel.

25. An agent of the Sheriff's Department located the vessel several hours later at Hideaway Marina, where Klenner had docked it. The agent informed Waldo of its location.

26. Waldo went to the vessel and found Klenner's phone number on a sign attached to the entrance. Waldo called Klenner and agreed to meet with him that day. Waldo also contacted his uncle and attorney, Thomas Wich ("Wich"), who joined Waldo at the vessel and was present when Waldo and Klenner first met.

27. Waldo informed Klenner that he owned the vessel and the parties initially agreed that Klenner would purchase it from Waldo for $19,500. Because Klenner could not pay the entire amount to Waldo immediately, it was agreed that Wich would prepare a note for the sale, the terms of which would permit Klenner to pay Waldo for the vessel in monthly installments of $507.06 for three and a half years. The parties made plans to meet at Wich's office the next day so that Waldo could show Klenner proof of ownership, specifically the bill of sale from Midriver Marine to Waldo, before the note would be signed.

28. Before leaving the vessel, Waldo showed Klenner how to start it and permitted him to move it to a new dock that Klenner had rented for the month of February. Klenner moved the vessel under its own power to this new location before the next day's meeting with Waldo at Wich's office.

29.     At the meeting, Klenner did not accept the bill of sale between Midriver Marine and Waldo as valid proof of ownership, and the note was not signed. Klenner was troubled by the fact that the date next to Waldo's signature was February 12, 2006, while the date next to the notary's signature was February 12, 2007. Klenner stated that he would not sign the note until he spoke with an attorney.

30.     After several days, Klenner had not consulted an attorney, and Waldo decided that he wanted Klenner to leave the vessel until an agreement was reached. Agents of the Broward County Sheriff's Department went with Waldo to the vessel on or about February 21, 2011, and it was agreed that Klenner would vacate the vessel by February 28, 2011.

31.     Klenner paid the vessel's docking costs of $400 for the month of February. Thus, by February 28, 2011, Klenner had procured towing, repair, and docking services for the vessel totaling $8,080.00.

### D.     *Movement of the Vessel to its Current Location*

32.     Klenner did not vacate the vessel as agreed by February 28, 2011. Instead, Klenner moved the vessel without Waldo's permission on March 1, 2011, to its current location at Banyan Bay Marina in Dania Beach, FL. The vessel was moved to Banyan Bay Marina under its own power.

33.     While at Banyan Bay Marina, the vessel was taken out of the water and placed in a sling. The transom was entirely removed so that certain alterations could be made. As a result, the rear portion of the vessel was severed and the vessel could

not be returned to the water without additional work. The vessel has remained in this condition ever since.

34.     Waldo was able to locate the vessel once again at Banyan Bay Marina. He immediately contacted the Broward County Sheriff's Department, whose agents told Klenner that he must stay away from the vessel. Klenner did as instructed.

35.     Klenner instituted this action *in rem* against the vessel on March 24, 2011, and the vessel was arrested by the United States Marshal at Banyan Bay Marina on  March 28, 2011, where it has remained ever since.

## II.     CONCLUSIONS OF LAW

### A.     *Introduction*

The primary legal determinations to be made in this matter are: (1) whether the vessel's transfer from Waldo to Abromavich constituted a sale, and, if not, whether some other legal arrangement was created by the transfer; (2) whether the vessel became abandoned upon the death of Abromavich; and (3) whether Klenner is entitled to compensation under the law of salvage for services he procured for the vessel, and, if not, whether he is entitled to compensation on an alternative legal theory. These issues will be examined in turn.

### B.     *Ownership of the Vessel*

The most essential determination required in this case is that of the vessel's ownership. The Court concludes that Waldo is the owner of the vessel. In normal circumstances, one need only conduct a title search with the appropriate state or federal authority to determine who owns a motor vehicle. This case is particularly

complicated because none of the parties in question – Waldo, Klenner, or Abromavich – properly registered title to the vessel in their name prior to Abromavich's death. Nevertheless, at the time of Abromovich's death, Waldo retained possession of a notarized bill of sale for the vessel, which would have been sufficient to transfer title to his name at any time with the Coast Guard. In fact, Waldo used this bill of sale to transfer title after this action was filed. The Court concludes that ownership of the vessel remains where the valid line of documentation ends: with Waldo.

Klenner has provided no convincing evidence to support the conclusion that Abromavich purchased the vessel from Waldo. Had Abromavich bought the vessel, we assume he would have registered title of the vessel in his name, as he did when he purchased the vessel's dinghy. Law enforcement's searches of the vessel uncovered no bill of sale or other documentation evidencing a transfer of ownership from Waldo to Abromavich, which Waldo appears to have always executed when buying or selling vessels. Further, the Court does not believe that Abromavich would have agreed to purchase a vessel that he could not start or operate. It is undisputed that only Waldo knew how to start the vessel before he showed Klenner how to do so in February, 2011. Abromavich needed Waldo to take the vessel to Mellon's dock for him, and there is no evidence that Waldo ever taught Abromavich how to start the vessel. This is information that the purchaser of any motor vehicle would surely require.

Accordingly, Klenner has not proven that Abromavich was the owner of the vessel. The burden of proof as to a particular fact is normally on the party to whom the fact is essential. *See KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543

12

U.S. 111, 124 (2004). Klenner's abandonment claim, see discussion *infra* at Part D, relies on a finding that Abromavich owned the vessel at the time of his suicide, and therefore Klenner carries the burden of proving Abromavich's ownership. Klenner has not met his burden of proof as to this fact, and the Court concludes that Waldo was the owner of the vessel at the time of Abromavich's death.

## C.   *Bailment*

The legal relationship created between Waldo and Abromavich upon transfer of the vessel was in effect a bailment. Under Florida law, a bailment is "a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner." *S & W Air Vac Systems, Inc. v. Department of Revenue, State of Florida,* 697 So. 2d 1313, 1315 (Fla. 5th DCA 1997). For a bailment to be valid:

> Generally, such a full delivery of the subject matter must be made to the bailee as will entitle him to exclude for the time of the bailment the possession of the owner and all other persons, give the bailee an independent and temporarily exclusive possession of the property, or sole custody and control, result in an actual change of legal as well as physical possession of the property from the bailor to the bailee, make him liable to the owner as the sole custodian of the property in the event of his neglect or fault in discharging his trust with respect to the subject matter, and require a redelivery of it by him to the owner or other person entitled to receive it after the trusts of the bailment have been discharged.

*Id.*

A bailment is a contractual relationship and may result from either an express contract or a contract implied by law. *Meeks ex rel. Estate of Meeks v. Florida Power &*

13

*Light Co.*, 816 So. 2d 1125, 1129 (Fla. 5th DCA 2002), *approved sub nom. BellSouth Telecommunications, Inc. v. Meeks*, 863 So. 2d 287 (Fla. 2003). The arrangement between Waldo and Abromavich possessed all the requisite attributes of a bailment. Abromavich was granted exclusive custody of the vessel and was responsible for ensuring its care and maintenance so that it did not sink. He was also responsible for providing a dock for the vessel. Although Waldo and Abromavich did not reduce the terms of their agreement to a writing, the bailment may be inferred from Waldo's testimony and is supported by the surrounding circumstances as evidenced in the record.

While a bailment requires the bailee to return the bailed property to the bailor, that clearly did not occur with Abromavich and Waldo. Rather, when Abromavich committed suicide, he effectively left possession of the vessel to Mellon, the owner of the property to which the vessel was attached. Despite the fact that Mellon wanted nothing to do with the vessel, Mellon nevertheless became a constructive bailee once law enforcement identified the vessel as her responsibility. A constructive bailee is a person who "acquires possession of another's property by mistake or accident, or by force of circumstances under which the law imposes upon him or her the duties of a bailee, when there is a lack of a meeting of the minds, an absence of any voluntary undertaking, and no reasonable basis for implying an intent of any mutual benefit." *Benz v. Benz*, 557 So. 2d 124, 126 (Fla. 3d DCA 1990) (quoting *Armored Car Service, Inc. v. First Nat. Bank of Miami*, 114 So. 2d 431, 434 (Fla. 3d DCA 1959)); 8A Am. Jur. 2d, Bailments § 2. When Klenner eventually took possession of the vessel from Mellon,

14

he became a bailee as well. As bailees, their interest in the vessel remained subordinated to that of the bailor, Waldo, at all times.

Nothing in the sequence of unauthorized transfers following Abromavich's death affected Waldo's status as the bailor and owner of the vessel. "An unauthorized transfer or encumbrance by the bailee of the subject matter of the bailment does not divest the bailor of title to the property." 8A Am. Jur. 2d, Bailments § 58 (citing *Higgins v. McCrea*, 116 U.S. 671 (1886)). "The fact that [a] transferee relied on [a] bailee's representation that he or she had complete power of disposition of the property, and [even if the transferee] paid full value in reliance on such a representation, does not protect the [transferee] against the bailor's assertion of rights as the true owner." *Id.* Therefore, even if Mellon and Klenner were laboring under the false representations of Abromavich and law enforcement that Abromavich owned and abandoned the vessel, only representations by Waldo himself could have affected Waldo's ownership interest in the vessel. Therefore, Klenner's interest in the vessel is limited to that of a bailee.

As a bailee, Klenner had certain duties toward the vessel that should be noted in light of the vessel's current condition. The final bailment between Waldo and Klenner was negotiated on February 21, 2011, and was to end on February 28, 2011. Waldo permitted Klenner to remain on the boat for an additional week as a courtesy so that he may have reasonable time to collect his belongings, and therefore the bailment was for the exclusive benefit of Klenner, the bailee. In a bailment for the sole benefit of the bailee, the bailee must redeliver the property entrusted to him or her in

15

good condition. 5 Fla. Jur 2d Bailments § 16; *see Union Bus Co. v. Smith*, 140 So. 631, 632 (Fla. 1932). Therefore, Klenner is obligated to return the vessel to Waldo in the same condition in which he received it.

## D.   *__Abandonment__*

The Court has carefully considered Klenner's claim that he acquired ownership of the vessel because it was abandoned. Under Florida law, there are two ways that ownership of property may be transferred by abandonment: (1) under the common law doctrine of abandonment; and (2) under Florida's lost and abandoned property statute, Fla. Stat. § 705.101 - 104. We conclude, however, that neither form of abandonment occurred in this case.

First, the common law doctrine of abandonment does not apply to this case because Waldo neither manifested nor possessed an intention to abandon the vessel. Abandonment of property requires a showing of actual acts demonstrating relinquishment of ownership accompanied by an intention to abandon. *Bobo v. Vanguard Bank & Trust Co., Inc.*, 512 So. 2d 246, 247 (Fla. 1st DCA 1987). "Abandonment is always voluntary and involves a positive intention to part with ownership." *Katsaris v. United States*, 684 F.2d 758, 762 (11th Cir. 1982). "The doctrine of abandonment has no application unless there is a total desertion by the owner without being pressed by any necessity, duty, or utility to himself, but simply because he no longer desires to possess the thing and willingly abandons it to whoever wishes to possess it . . . . Intent is a question of fact." *Id.*

16

For example, in *Simkin v. Norcross*, an ex-wife claimed her ex-husband had abandoned a houseboat because he left it at their dock "in poor condition" after it had run aground. 610 F. Supp. 691, 694 (S.D. Fla. 1985). She arranged for a third party to move and repair the "abandoned" houseboat, and therefore claimed she was entitled to keep it. *Id.* The court found that the ex-husband had left the houseboat in an acceptable condition and had demonstrated neither overt acts nor an intention to relinquish his ownership of it. *Id.* Accordingly, the houseboat was not abandoned and the ex-husband retained ownership despite the fact that he had left it for several months. *Id.* at 695.

As with the ex-husband in *Simkin*, Waldo left the vessel at Mellon's dock in an acceptable condition and never demonstrated overt acts or an intention to relinquish his ownership of the vessel. To the contrary, even though Waldo entrusted the vessel to Abromavich, he regularly drove by Mellon's dock to verify the vessel's location, he had law enforcement on the look-out for the vessel's unauthorized movement, and located the vessel only three weeks after Klenner moved it from Mellon's dock. It is clear that Waldo had no intention of abandoning the vessel, and he performed no overt acts indicating a desire to relinquish ownership of it.

Klenner claims,however, that it was *Abromavich* who abandoned the vessel. This is not possible because Abromavich did not have the capacity to abandon the vessel as a bailee; only Waldo, the vessel's owner, could have abandoned it. "Abandonment has no application unless there is a total desertion *by the owner* . . . ." *Katsaris*, 684 F.2d at 762 (emphasis added). Under Florida law bailees cannot effect

abandonment of property. "By definition, the concepts [of abandonment and bailment of property] cannot co-exist. Abandonment is a relinquishment of the owner's legal right to a thing . . . . Bailment, on the other hand, requires an owner of the object (the bailor) and the possessor (the bailee)." *Meeks*, 816 So. 2d at 1129. Therefore, common law abandonment of the vessel could not have been effected by Abromavich, and the vessel was never abandoned under the common law.

Second, transfer of ownership was not achieved under Florida's lost or abandoned property statute, Fla. Stat. § 705.101-104, because the vessel never satisfied the statute's definition of abandoned property and, even if it did, the procedure required to transfer ownership of abandoned property under the statute was not followed. Under the statute, "'[a]bandoned property' means all tangible personal property that does not have an identifiable owner and that has been disposed on public property in a wrecked, inoperative, or partially dismantled condition or has no apparent intrinsic value to the rightful owner." Fla. Stat. § 705.101(3). We do not believe that this definition accurately describes the vessel when it was docked at Mellon's home. The ship was neither wrecked nor partially dismantled, and it clearly had intrinsic value, whatever the amount might have been, to the rightful owner. The only way that the vessel could have satisfied the statutory definition of "abandoned property" would have been through the phrase "left in an . . . . inoperative . . . . condition" because Waldo had configured the electricity so that only he could start the vessel. However, to classify the vessel as being in an "inoperative condition" does not seem entirely accurate. A car left on the street is not in an "inoperative condition"

18

simply because its doors are locked. The vessel was capable of operation once Waldo's security device was disabled.

The statute's definition of "lost property" is more applicable to the vessel as it stood at Mellon's dock. Under the statute, "'[l]ost property' means all tangible personal property which does not have an identifiable owner and which has been mislaid on public property . . . . in a substantially operable, functioning condition or which has an apparent intrinsic value to the rightful owner." Fla. Stat. § 705.101(2). All evidence demonstrates that the vessel was substantially operable at all times; Waldo had no difficulty starting the vessel during his first meeting with Klenner, even though Klenner could not start it on his own. When Klenner moved the vessel to a new dock in mid-February, 2011, and when he took the vessel to Banyan Bay Marina without Waldo's permission on March 1, 2011, he did so by starting the vessel and taking it there under its own power. Therefore, at the time Klenner removed the vessel from Mellon's dock, it was substantially operable, had ascertainable value to the owner, and was "lost" property under Fla. Stat. § 705.101(2).

Whether the vessel was technically "abandoned" or "lost" under the statute, transfer of title to Klenner could not have occurred under either classification because the statute's notice provisions for lost and abandoned property were not followed. Under the statute, transfer of title to lost and abandoned property may only occur once the notice requirements of § 705.103 have been satisfied. Fla. Stat. § 705.104(1). The first notice requirement is the same for both lost and abandoned property. Under § 705.103(2), "whenever a law enforcement officer ascertains that an article of lost or

19

abandoned property is present on public property and is of such nature that it cannot be easily removed, the officer shall cause a notice to be placed upon such article" in a specific format, stating that the property will be removed by law enforcement within five days. Fla. Stat. § 705.103(2). On the basis of law enforcement's failure to satisfy this requirement alone, title to the vessel could not have transferred to Klenner under the statute, regardless of whether the vessel was "lost" or "abandoned."

Assuming the vessel was "lost," even if law enforcement had taken possession of the vessel five days after posting the required notice, law enforcement still did not follow the statute's additional notice requirements for lost property. Under § 705.103(b), law enforcement would have needed to then publish notice of its intended disposition of the vessel in a newspaper of general circulation in Broward County, and retain the vessel for 90 days so as to give the owner adequate time to come forward and claim it. These requirements were not satisfied, and therefore title could not have transferred to Klenner under the "lost" property provisions of the statute.

Assuming that the vessel was "abandoned," even if law enforcement had taken possession of it five days after posting the required notice, law enforcement could not have simply given the vessel to Klenner. Instead, law enforcement would have had five options: (1) retain the vessel for its own use or for use by the state or unit of local government; (2) trade the vessel to another unit of local government or state agency; (3) donate the vessel to a charitable organization; (4) sell the vessel; or (5) notify the appropriate refuse removal service. Fla. Stat. § 705.103(2)(a). None of these options

were chosen by law enforcement. Therefore, title could not have transferred to Klenner under the "abandoned" property provisions of the statute.

In sum, the Court rejects Klenner's claim to title of the vessel based on Florida's lost or abandoned property statute, Fla. Stat. § 705.101 - 104. As a result, Klenner did not acquire ownership of the vessel under a common law or statutory theory of abandonment.

### E.   _Salvage_

The Court also rejects Klenner's claim of entitlement to a salvage award for repairs he made because the vessel was never in peril. "To be entitled to a salvage award, the plaintiff has the burden of proving three elements: (1) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance; (2) a voluntary act by the salvor under no pre-existing official or contractual duty to the owner; and (3) success in saving, or in helping to save at least part of the property at risk." _Fine v. Rockwood_, 895 F. Supp. 306, 309 (S.D. Fla. 1995); _compare Klein v. Unidentified Wreck & Abandoned Sailing Vessel,_ 758 F.2d 1511, 1515 (11th Cir. 1985) (affirming rejection of salvage award where vessel not in peril and owner may not have even desired to have property "rescued"), _with B.V. Bureau Wijsmuller v. United States,_ 702 F.2d 333, 338 (2d Cir. 1983) (finding that the plaintiff had performed a salvage service where the vessel was stranded upon a rocky ledge and was, therefore, in marine peril). Because no maritime peril existed, and because Klenner did not save any part of the vessel, the first element and third element of Klenner's salvage claim are not satisfied, and his salvage claim must fail.

The first element of Klenner's salvage claim is not satisfied because the vessel was never in peril, nor was peril reasonably to be apprehended. To be entitled to a salvage award, the plaintiff must prove a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance. *Id.* "To determine whether a maritime peril existed, the Court examines whether, at the time the assistance was rendered, the ship was in a situation that might expose her to loss or destruction." *Id.* The danger need not be immediate or actual. *Fort Myers Shell and Dredging Co. v. Barge NBC*, 404 F.2d 137, 139 (5th Cir. 1968). All that is necessary is a reasonable apprehension of peril. *Id.* However, "if the vessel has the situation under control such that there is no reasonable apprehension for her safety in the future if left to her own unaided efforts, then there is an absence of peril." *Fine*, 895 F. Supp. at 309.

The circumstances giving rise to a reasonable apprehension of peril must nevertheless be more serious than those that were present in this case. Some historical examples of scenarios giving rise to a reasonable apprehension of peril include: "a vessel moored to a buoy that was blown adrift, vessels in tow that have broken loose during storms, a ship drifting near shoal water flying distress signals, and an ancient abandoned shipwreck." *Id.* Absent extreme circumstances, peril simply cannot be reasonably apprehended for a ship that is safely docked in a canal with no evidence that it is rapidly taking on water. For example, in *Fine*, a boat was secured with lines to a dock in channel waters so shallow that the bottom of the boat was settling onto the channel bottom. *Id.* A hole had developed in the ship's hull and scuba divers began efforts to repair the boat. *Id.* The scuba divers subsequently sought a salvage award.

*Id.* at 307. The court concluded that because "the weather was clear and the seas were calm . . . . [even though] there was a hole in the hull, the circumstances were not such that exposed the [boat] to loss or destruction, or caused a reasonable apprehension for her future safety." *Id.*

As in *Fine*, the vessel in this case was never in peril, nor was peril to be reasonably apprehended. Klenner has provided no reliable evidence showing that the vessel was ever at risk of sinking. The record makes clear that the vessel was repaired by Midriver Marine and Waldo after it was damaged in 2004, and for the following seven years, the vessel never sank, nor came close to doing so. All images of the vessel show it sitting at an acceptable height in the water. The vessel was at Mellon's dock in Lighthouse Point for two years; in that time, it was regularly seen by law enforcement, it was periodically checked on by Waldo, and it was inhabited by Abromavich. There is no evidence that the vessel was ever at risk of sinking during this time. When Klenner took possession of the vessel, nothing had changed. There is no reason to believe that the vessel was in peril of sinking, and accordingly, the first element of Klenner's salvage claim is not satisfied.

The third element of Klenner's salvage claim is not satisfied for essentially the same reason that the first element is not satisfied. To be entitled to a salvage award, the plaintiff must prove he succeeded in saving, or in helping to save at least part of the property at risk. *Id.* By definition, if the vessel was never at risk, Klenner could not have successfully saved any part of the vessel. There was nothing from which to save

it. Therefore the first and third elements of Klenner's salvage claim are not satisfied and he cannot be compensated under the law of salvage.

**F.**   *__Maritime Lien__*

While the Court rejects the proposition that a maritime lien has arisen in this case under the law of salvage, see discussion *supra* at Part E, we do find that Klenner is entitled to a maritime lien under the Federal Maritime Lien Act for the $8,080.00 of necessaries he procured for the vessel between January 21, 2011, and February 28, 2011. The Federal Maritime Lien Act "grants maritime liens to particular persons based on their relationship to, or service of, a vessel." *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868 (11th Cir. 2010); 46 U.S.C. § 31341-31343. For example, the Act grants a maritime lien to a person providing "necessaries" to a vessel. *See id.* § 31342(a). "'[N]ecessaries' include repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). "Necessaries encompass all those services which inure to the ship's benefit." 2 Benedict on Admiralty § 39. Significantly, the lien attaches to the vessel even if the vessel owner has not personally contracted for those services. *S.E.L. Maduro (Florida), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987).

Under the Act, certain persons are presumed to have authority to procure necessaries for a vessel. 46 U.S.C. § 31341. One such person is the "master" of the vessel. 46 U.S.C. § 31341(a)(2). A "master" of a vessel is one who is "responsible for the vessel's navigation and the safety and care of the crew and cargo." Black's Law Dictionary 1065 (9th ed. 2009). As a bailee implied at law, Klenner was legally

24

responsible for the vessel when it was in his possession. *See Armored Car Serv., Inc. v. First Nat'l Bank of Miami*, 114 So.2d 431, 434 (Fla. 3d DCA 1959) (identifying the various duties a bailee has toward bailed property). Therefore, Klenner was acting as the vessel's master under the Act and was presumed to have authority to procure necessaries for the vessel during the bailment period, which ended on February 28, 2011, when Klenner was required to vacate the vessel. The towing, repair, and docking services Klenner procured for the vessel between January 21, 2011, and February 28, 2011, fall squarely within the Act's definition of "necessaries." The fact that Klenner did not contract directly with Waldo for these "necessaries" is immaterial because he acquired possession of the vessel by force of circumstances under which the law imposed upon him the duties of a bailee. See *Benz,* 557 So. 2d at 126.  Accordingly, Klenner has established a maritime lien against the vessel for the value of these necessaries, totaling $8,080.00.

The Act grants maritime lienholders the right to bring a civil action *in rem* to enforce the lien. 46 U.S.C. § 31342(a). In other words, "[a] maritime lien gives to its holder a property right in a vessel, and the proceeding *in rem* is . . . . a means of enforcing the property right." *Merchs. Nat'l Bank v. Dredge Gen. G.L. Gillespie*, 663 F.2d 1338, 1346 (5th Cir. 1981). The liens vest in "creditors . . . . the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds."*Crimson Yachts*, 603 F.3d at 870 (quoting *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 280 (1940)). As such, if Waldo is unable to pay Klenner the balance of his $8,080 maritime lien, the vessel may be sold, Klenner will have priority to the

proceeds of the sale, and Waldo will retain the remainder (after the Marshal's expenses are also satisfied).

In sum, Klenner holds a maritime lien against the vessel for $8,080.00, representing the total value of necessaries he procured for the vessel between January 21, 2011, and February 28, 2011. Klenner cannot assert a lien for any expenses he incurred after February 28, 2011, because the final bailment between Waldo and Klenner expired on that date, and it was Klenner's duty to return the vessel to Waldo in good condition, see discussion *supra* at Part B. Accordingly, Klenner is liable for any costs incurred due to his breach of the final bailment he established with Waldo on or about February 21, 2011, and Klenner's lien against the vessel is limited to $8,080.

### III. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that**:**

A. Judgment shall be entered in favor of the Intervenor, Michael Waldo, on Count 1 of the Amended Verified Complaint and Counts I and II of the Complaint in Intervention. Declaratory judgment shall be entered that finds the Intervenor, Michael Waldo, is the legal owner of the vessel M/Y El Presidente, Official No. 1036726, and is entitled to restoration of the vessel to his possession.

B. As to Count 2 of the Amended Verified Complaint, judgment shall be entered in favor of Plaintiff, Robert Klenner, and against the vessel M/Y El Presidente for the amount of $8,080.00, the value of the maritime lien he holds against the vessel under the Federal Maritime Lien Act rather than under the law of salvage.

C.      The vessel shall be released to Waldo after the *in rem* judgment to Klenner is satisfied and all dockage and custodial expenses are satisfied.

**DONE AND ORDERED** in Chambers at Miami, Florida this 1st day of August, 2012.

_____
EDWIN G. TORRES
United States Magistrate Judge